OPINION
{¶ 1} This case is before us on the appeal of King Virgil Cheek (King) from a probate court judgment issued against him in the amount of $166,532.03. King was originally appointed in August, 1993, as trustee of funds bequeathed to the four minor children of King's deceased brother, Albert Cheek, Sr. In addition, King was the executor of his brother's estate.
 {¶ 2} In June, 2001, King was discharged as trustee, and a successor trustee (J. Timothy Cline) was appointed. After filing an inventory, Cline brought a motion to surcharge King for negligently administering the trust fund. When the motion was brought, the trust had no liquid assets, even though it would have originally contained more than $250,000 (if all proper distributions had been made from the estate). The primary remaining trust assets were $61,000 in promissory notes executed by Edith Cheek, who was Albert Sr.'s second ex-wife and the mother of the four minor children. The trust assets also included $21,450 in promissory notes from Albert Cheek, Jr., who was an adult son from Albert Sr.'s first marriage.
 {¶ 3} In support of his appeal, King raises the following assignments of error:
 {¶ 4} "I. The trial court erred in granting Appellee's motion to surcharge.
 {¶ 5} "II. For a court to acquire jurisdiction there must be a proper service of summons or an entry of appearance, and a judgment rendered without proper service or entry of appearance is a nullity and void.
 {¶ 6} "III. So long as a trustee acts in good faith and exercises sound discretion, a court will not substitute its judgment for that of the trustee. The settlor has placed this discretion in the trustee because he desires the trustee's honest judgment and not that of the court.
 {¶ 7} "IV. Civil judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."
 {¶ 8} After considering the record and applicable law, we find the assignments of error without merit, except for one limited aspect of the fourth assignment of error. Accordingly, the trial court judgment will be affirmed in part and reversed in part, and remanded for consideration of issues related to an $18,000 promissory note executed by Edith Cheek.
 I {¶ 9} In the first assignment of error, King attacks the trial court's jurisdiction to entertain the motion for surcharge. King concedes such motions have traditionally been used to obtain relief from mismanagement of trust funds. Nonetheless, King contends this practice is a misapplication of R.C. 2109.42, which provides that:
 {¶ 10} "[s]ubject to section 2109.372 of the Revised Code, a fiduciary who has funds belonging to a trust which are not required for payment of current obligations of his trust or distribution shall, unless otherwise ordered by the probate court, invest such funds within a reasonable time according to section 2109.37 or 2109.371 of the Revised Code. On failure to do so, such fiduciary shall account to the trust for such loss of interest as is found by the court to be due to his negligence."
 {¶ 11} According to King, the wording of this statute authorizes surcharge only when a trustee has failed to invest funds within a reasonable time. We disagree, as the power of probate courts has not been so narrowly construed. As has been noted,
 {¶ 12} "[a]lthough not specifically mentioned in R.C. Chapter 2109, pursuant to the probate court's plenary power under R.C. 2101.24(C), a motion for surcharge has traditionally been the method employed to obtain relief from the mismanagement of trust funds under R.C. 2109.42
and the losses occasioned thereby." In re Testamentary Trust of Hamm
(1997), 124 Ohio App.3d 683, 690, citing In re Guardianship of Zimmerman
(1943), 141 Ohio St. 207, paragraphs two through four of the syllabus, and Miller v. Proctor (1870), 20 Ohio St. 442, 447.
 {¶ 13} In Zimmerman, the Ohio Supreme Court stressed that the "Probate Court has a plain duty and plenary power to require * * * [guardians] to account fully for their care or lack of care of the assets belonging to the estates of * * * wards. It is the duty of the Probate Court to fix the liability, if any, to the wards * * *."141 Ohio St. at 224. This statement is fully consistent with subsequently enacted R.C.2101.24(A)(1)(m), which gives probate courts exclusive jurisdiction "[t]o direct and control the conduct of fiduciaries and settle their accounts." Furthermore, R.C. 2104.24(C) states that "[t]he probate court has plenary power at law and in equity to dispose fully of any matter that is properly before the court, unless the power is expressly otherwise limited or denied by a section of the Revised Code."
 {¶ 14} Under existing case law, a motion for surcharge is clearly a proper method for rectifying a trustee's mismanagement of trust assets. See, e.g., Whitaker v. Estate of Whitaker (1995),105 Ohio App.3d 46 (entering order surcharging discharged trustee $139,998.74, based on trustee's mismanagement, poor decision-making and deception, which caused many trust expenses to be disallowed), and In reTestamentary Trust of Hamm, Geauga App. Nos. 2001-G-2363 and 2001-G-2366, 2002-Ohio-2106, ¶¶ 4 and 10 (involving motion to surcharge surety after final accounting showed that the trustee had mismanaged trust assets. The trustee had previously been found liable by the probate court.) See also, In re Estate of Minella (June 4, 1999), Hamilton App. No. C-980413, 1999 WL 354336. In Minella, a trustee was surcharged for fraud and for negligent administration of the estate. 1999 WL 354336, *4. Among other things, the trustee argued that surcharge under R.C. 2109.42 was improper, because he had no obligation to invest assets; instead, his duty simply was to distribute estate assets to the named beneficiaries. In this regard, the First District Court of Appeals stated that:
 {¶ 15} "[a]ssuming arguendo that it was inappropriate to surcharge * * * [the trustee] under R.C. 2109.42, we nevertheless conclude that the probate court, under its plenary powers, was vested with the authority to surcharge * * * [the trustee] for losses sustained by the estate's rightful heirs due to his fraudulent actions and misadministration of the estate, both of which constituted breaches of his fiduciary duties." Id. at *7.
 {¶ 16} Similarly, in the present case, King's poor decision-making, negligence, and mismanagement caused numerous trust expenses to be disallowed and funds to be dissipated. Accordingly, even if surcharge were improper under R.C. 2109.42, the probate court still had plenary power to dispose of issues pertaining to King's acts. Based on the preceding discussion, the first assignment of error is without merit and is overruled.
 II {¶ 17} In the second assignment of error, King claims that the trial court lacked personal jurisdiction over him because no "complaint" was filed, and King was not served by proper service of summons. Cline responds by pointing out that the issue of personal service has been waived because King failed to raise it in the trial court. Moreover, Cline contends that King was, in fact, served with certified mail notice of the motion to surcharge.
 {¶ 18} As a preliminary point, we note that this case did not involve the filing of a "complaint." Instead, the court entertained a motion to surcharge an individual who occupied a fiduciary position as part of a pending case. Consequently, the requirements for service of process following the filing of a civil action would not be strictly applicable.
 {¶ 19} On the other hand, procedural due process requirements, of notice and an opportunity to be heard, would apply. See, e.g., Whitaker,105 Ohio App.3d 46, 53. King does not dispute that he received notice of the hearing on the motion to surcharge. In fact, arguing a lack of notice would be difficult, since King appeared at all hearings, and also received two continuances that he requested. More important, King never contested personal jurisdiction, in writing or at either of the hearings held on the motion to surcharge. Under the circumstances, any objection has been waived and will not be considered in this court. See Civ.R. 12(H)(1), and In re Seaman (March 9, 2001), Montgomery App. No. 18530, 2001 WL 227392, *1. See also, Title Guarantee Trust Co. v. Wilby
(1946), 78 Ohio App. 183, 189.
 {¶ 20} Based on the record and transcripts of the hearings, King clearly received adequate notice and an opportunity to be heard. Furthermore, King's failure to object waived any issues of personal jurisdiction. Accordingly, the second assignment of error is without merit and is overruled.
 III {¶ 21} In the third assignment of error, King claims that the probate court did not find that he failed to act in good faith or failed to exercise sound discretion. As a result, King contends that the court improperly substituted its judgment for King's judgment, as trustee. Cline's response is that a finding of negligence and improper transfer of funds is the same as a finding that King failed to act in good faith or failed to exercise good judgment.
 {¶ 22} After holding two hearings and considering various documents, the trial court disallowed various expenses as negligent transfers/administration of trust funds. These items included a new Toyota automobile purchased for the use of Edith Cheek (the decedent's ex-wife); auto insurance premiums paid for the Toyota; and various funds dispersed to Albert Cheek, Jr., Edith Cheek, and Kahlil Cheek, who were all non-beneficiaries of the trust. In addition, $38,266.49 in funds that should have been transferred from the estate to the trust was "lost," and was never convincingly explained. The total of the alleged negligent transfers was about $166,532.
 {¶ 23} To support his claim that the trial court improperly substituted its judgment for that of the trustee, King relies onSherman v. Sherman (1966), 5 Ohio St.2d 27. In Sherman, the Ohio Supreme Court held that:
 {¶ 24} "[s]o long as a trustee acts in good faith and exercises sound discretion, a court will not substitute its judgment for that of the trustee. The settlor has placed this discretion in the trustee because he desires the trustee's honest judgment, and not that of the court." Id. at 34.
 {¶ 25} We agree with these general principles. However, this is not a case where the trial court substituted its judgment for that of the trustee. In the will, King was given power to hold money and assets in trust for the benefit of the settlor's children, "Shayla Cheek, Robert Edgar Cheek, Renaud Basil Cheek, and Randall Edward Cheek." The will further provided that the trustee had sole and absolute discretion to:
 {¶ 26} "use and expend from the income and principal thereof so much as he shall determine to be necessary for * * * [the children's] care, comfort, maintenance, support, education, general well-being, and to assist a child in purchasing a home or in establishing a business or profession, until the youngest of * * * [the] living children shall attain the age of twenty-one (21) years, at which time the Trustee shall divide the entire remaining principal of the trust fund and any accrued income thereon into as many equal shares as there are children * * * then living."
 {¶ 27} Unquestionably, the will grants broad discretion to the trustee. However, even when trustees are given broad discretion, they still have a "continuing duty to act reasonably and in the best interests of the trust's beneficiaries." In re Estate of Winograd (1989),65 Ohio App.3d 76, 81. Trustees are also bound by obligations inherent in a fiduciary relationship, which is "`one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust.'" Stone v. Davis (1981), 66 Ohio St.2d 74, 78, quoting In re Termination of Employment (1974), 40 Ohio St.2d 107, 115.
 {¶ 28} In finding that King negligently administered trust funds, the trial court was simply performing its duty to make certain that King acted reasonably and in the beneficiaries' best interests. Accordingly, the third assignment of error is without merit and is overruled.
 IV {¶ 29} In the fourth assignment of error, King contends that the trial court's decision was against the manifest weight of the evidence. In deciding if a judgment is sustained by the weight of the evidence, the standard for civil cases (taken from the criminal context), is that:
 {¶ 30} "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 1997-Ohio-52, quoting from State v. Martin (1983), 20 Ohio App.3d 172, 175. See also, Bede v.Dayton Power Light Co., Montgomery App. No. 18705, 2002-Ohio-2378, ¶¶ 34-35.
 {¶ 31} "[D]espite this heightened review power, `we will not disturb the choice made by the trier of fact between credible witnesses and their conflicting testimony unless it is so incredible that it defies belief'" Henderson v. Fillinger, Greene App. No. 97 CA 110,2002-Ohio-104, 2002 WL 27319, *1.
 {¶ 32} In claiming that the judgment was against the manifest weight of the evidence, King makes three main points. First, he argues that while he and Cline were sworn in on both hearing dates, no one testified. We disagree, and find nothing objectionable in the procedure the trial court followed. At the hearings, the court properly swore in both Cline and King, with the clear intent of making a record. Each side then presented evidence, and the court asked questions during the presentation. Admittedly, King testified in narrative form, with occasional questions from the court. However, that format was used because King acted pro se and did not have an attorney available to ask questions. Nevertheless, King had ample opportunity to offer any explanation he wished about trust expenditures.
 {¶ 33} In this regard, we note that "[p]ro se civil litigants are * * * not to be accorded greater rights and must accept the results of their own mistakes and errors." Meyers v. First Nat. Bank of Cincinnati
(1981), 3 Ohio App.3d 209, 210. If King were dissatisfied with the procedure followed, he could have objected or could have hired an attorney. Since he did not choose to do either, he must accept the results of his own choices. Furthermore, as we stressed earlier, the only due process requirements to which King was entitled were notice and an opportunity to be heard. Dawson v. Pauline Homes, Inc. (1958),107 Ohio App. 90, 92. King was afforded these rights, and chose to proceed without an attorney. Consequently, King's first argument does not provide a basis for finding that the trial court decision was against the manifest weight of the evidence.
 {¶ 34} King's second claim in this regard is that no exhibits were entered into evidence. Again, we disagree, as King was told during the hearing to leave various items with the court, and that the items would be marked as exhibits. In addition, Cline identified and testified about various exhibits, which were then admitted into evidence. See T. p. 17. While the court's comments about King's own exhibits could have been a bit more precise, the Court clearly intended to also admit King's exhibits into evidence. See T. 61. In any event, King never raised this issue at trial, nor did he refer to it in the post-trial memorandum filed in the trial court. Accordingly, King waived the issue. See, e.g., TitleGuarantee Trust Co., 78 Ohio App. 183, 189. Finally, we note that the trial court did refer extensively to the exhibits in its decision and entry, again indicating that the court did, in fact, admit the exhibits.
 {¶ 35} King's final argument is that multiple assessments were made against him for the same expenditures from the trust. For example, King claims that payments from trust funds to Edith Cheek and Albert Cheek, Jr., are listed as "negligent transfers," and also as "loans," meaning that charges for these items were duplicated.
 {¶ 36} After reviewing the record, we find the following items supported by the weight of the evidence: negligent transfers (by check) in these amounts: 1) $4,588.69 in fees to the estate of Albert Cheek, Sr. that were not properly documented; 2) $1,620.25 for auto insurance; 3) a $6,317.13 loss for purchase of a Toyota automobile for Edith Cheek; 4) $413.66 for rust-proofing for the Toyota; 5) $281.04 for auto insurance; 6) $690 for King's travel to Knoxville in 1997; 7) $279.25 for a hotel bill for Edith Cheek; 8) $3,460 paid to Kahlil Cheek, son of King Virgil Cheek; 9) $1,200 paid to Albert Cheek, Jr.; 10) $26,600 paid to Edith Cheek; and 11) $357.52 in payments to Nationwide Mutual and Bell Atlantic. The total of these sums is $45,815.54.
 {¶ 37} In addition, the record indicates that as trustee, King received $72,173.91 from the estate of Albert Cheek, Sr., but deposited only $33,907.42 in the trust account. Therefore, $38,266.49 in funds was missing and has not properly been accounted for. King claimed this was due to some type of math error, but his testimony was not convincing. Accordingly, the total of proper surcharges for the checks and missing funds is $84,082.03.
 {¶ 38} The amount of the judgment minus the above sum is $84,450. This equals the combined total of promissory notes from Albert Cheek, Jr., and Edith Cheek to the trust. These notes were not introduced as exhibits, but are referred to in the inventory filed by the successor trustee on August 14, 2001. At that time, the trust had liquid assets of $1,882.50. The only other assets in the trust were notes receivable from Edith Cheek, for $61,000, and from Albert Cheek, Jr., for $21,450.
 {¶ 39} King suggests that he is being surcharged for the same amounts more than once, since he has already been held responsible for $26,600 in payments to Edith, and $1,200 in payments for Albert. We agree that the record is somewhat confusing — but this is primarily because King failed to properly account for funds and provide documentation of his actions.
 {¶ 40} According to the trial court entry, Albert's indebtedness included: 1) a $5,000 note, dated December 22, 1995; 2) a $3,500 note, dated February 16, 1996; 3) a $2,500 note, dated July 2, 1997; 4) a $9,300 note, dated October 30, 1998); and 5) a $1,150 note dated November 8, 1999.
 {¶ 41} The total amount the trial court surcharged for transactions involving Albert was $22,650. This included the $1,200 we already mentioned, plus $21,450 in promissory notes. Checks from the trust to Albert, or cashed on Albert's behalf total only $10,892. Therefore, on the surface, King's claim of "double-charging" could be correct. However, simply because checks were not written does not mean that the money was not loaned or spent. For example, the third accounting filed by King mentions an $11,600 wire transfer of stock to Edith. Since stock was part of the trust assets, wire transfers could have been made without writing a check. In fact, King's account indicates this was the case, as the wire transfer was made directly to Edith by the stock broker. In this regard, we note that King had the burden of establishing the validity of the disbursements, or at least of explaining his actions once the trustee provided evidence of negligent administration. TitleGuarantee Trust Co., 78 Ohio App. 183, 192, and In re Estate ofButler (1940), 137 Ohio St. 96, paragraph three of the syllabus. However, King failed to adequately explain or document his actions.
 {¶ 42} The October 30, 1998 promissory note of Albert was covered by two checks totaling $9,300. The rest of the checks written to Albert, or on his behalf, were from 1997, and totaled $1,200, or about the amount of Albert's November, 1999 note. These two notes thus account for the $10,892 in checks documented in the record.
 {¶ 43} Notably, Albert's remaining promissory notes (totaling $11,500) are dated before the time any checks were written to Albert. As a result, this debt could not have been derived from the checks written to Albert, and awarding a surcharge for this sum would not have duplicated the amount already awarded for the checks.
 {¶ 44} In view of the preceding discussion, the trial court did not err when it included the promissory note amounts in the surcharge for money given to Albert Cheek, Jr. As we said, even if King did not write checks for those amounts, that does not mean money was not given to Albert. In this regard, we note that if Albert Cheek, Jr., did not receive money from the trust, King would have had no reason to obtain promissory notes and include them as trust assets. By the same token, Albert would have had no reason to sign promissory notes for money he did not receive.
 {¶ 45} The record would have been more complete if the promissory notes had been filed as exhibits. However, there is apparently no dispute about their existence or validity. In fact, King, himself, listed the notes from Albert Cheek, Jr. as trust assets in his third accounting. King has also not claimed the notes are invalid. Accordingly, the trial court did not err by adding the amount of Albert's promissory notes to the surcharge.
 {¶ 46} The remaining issue is the $61,000 in notes attributed to Edith Cheek, including: 1) a $43,000 note dated August 31, 1997, and 2) an $18,000 note dated November 12, 1999. Again, King claims he is being charged excessively, since the trial court already made a surcharge award of $26,600 for checks written to Edith. At the time of $43,000 note, however, the existing checks to Edith totaled only $18,800. Consequently, even if we agreed with King, $24,200 would still be unaccounted for by this explanation.
 {¶ 47} However, in view of King's own testimony, we believe that the August 31, 1997 note relates to around $40,000 the trust lent Edith to purchase a house. Specifically, King admitted in his testimony that the trust had advanced Edith $40,000 for this purchase. King also submitted a memorandum that he wrote to an attorney in 1999, to explain various actions he took concerning the trust. In the memorandum, King says that he previously advanced money to Edith for the purchase of a $300,000 home in an upscale suburban area of Knoxville, Tennessee.
 {¶ 48} In his testimony at trial, King suggested that a second mortgage be placed on the house and that all "additional" monies advanced to Edith should also be included. Again, there is no check in the trust exhibits showing an expenditure of $40,000, nor did anyone testify that such a check existed. Nonetheless, even though no "check" was written for $40,000, that does not mean the funds were not transferred by some vehicle other than a check. In fact, King's testimony verifies that the funds were spent.
 {¶ 49} In the course of deciding this appeal, we have reviewed all the documents before the trial court. As of September 4, 1997 (or the end of the second account), the trust should have contained about $148,685 in liquid assets — at least according to the second account that was filed. However, the third account, which was filed on December 10, 1999, indicates that liquid assets on hand at the end of the second accounting period were only $69,880.57 (this figure also includes an adjustment noted on the third account for a $6,010.50 overstatement of income on the second account).
 {¶ 50} The third account also reports assets of $54,000 in notes payable from Edith and Albert. However, even if these assets are included (and correction is made for an asset listed twice), the total "assets" of the trust at the end of the second account period (or the beginning of the third accounting period) would be only $123,880.07. This is about $18,795.16 less than the trust should have contained, based on the figures reported in the second account.
 {¶ 51} The reality is that listed disbursements in the third accounting period, including $62,002.46 in checks and an $11,602 wire transfer of stock to Edith (which was not discussed in the surcharge hearing), appear to exceed the reported liquid assets in the trust between 1997 and 1999. In view of the many discrepancies and accounting errors, we have doubt about the validity of many asset and disbursement figures that King submitted. Again, King had the obligation to explain these points, but did not.
 {¶ 52} In any event, King indicated in a memorandum to his own attorney in November, 1999, that the "liquidity of the trust is temporarily exhausted." At that time, the only trust assets were the promissory notes from Albert and Edith. The subsequent inventory in August, 2001 showed, as we said, only about $1,881 in liquid assets, and the promissory notes from Albert and Edith.
 {¶ 53} As we indicated, the record is somewhat confusing. Based on the above evidence, the trial court could reasonably have found that Edith received at least $40,000 in addition to the $26,600 already surcharged. Edith also received an $11,600 wire transfer of stock that the court did not discuss. In view of these facts, we find no error as to the surcharge for the $43,000 promissory note.
 {¶ 54} However, the record does not clearly indicate what part of the $18,000 promissory note, if any, related to the $11,600 wire transfer, or possibly to other transfers of stock that would not be reflected by checks written on the trust account. Alternatively, the note may have related to the $26,600 in checks that was already surcharged. The note was executed in 1999, and may have been an attempt to recoup some of the funds that were previously given to Edith. Due to the lack of clarity in the record about this point, we think the fourth assignment of error has merit, in part. The issue on remand, however, will be limited to consideration of the relationship, if any, between the $18,000 promissory note and the $26,600 surcharge already granted for checks written to Edith Cheek.
 {¶ 55} In view of the preceding discussion, the first, second, and third assignments of error are overruled. The fourth assignment of error is overruled in part and sustained in part. Accordingly, the judgment is affirmed as to $148,532.03 of the award against King, and reversed as to $18,000 of the award against King. This case will be remanded for limited consideration of the amount, if any, of the $18,000 promissory note that can be traced to checks written on Edith Cheek's behalf, or to wire transfers of stock or other disbursements that were not included in the $26,600 surcharge.
WOLFF, J., and YOUNG, J., concur.